

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

Facebook Account User Identification Number
"100009392854252"

Case No. 16-M-082

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. § 2113(a) and (d), 1951, and 924(c)

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Benjamin Hruz, FBI
_____
Printed Name and Title

Sworn to before me and signed in my presence:

Date: July 15, 2016

_____
Judge's signature

City and State: Milwaukee, Wisconsin          Honorable David E. Jones          , U.S. Magistrate Judge
Printed Name and Title

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Benjamin Hruz, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the user ID.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed for over nineteen years. I am currently assigned to the Milwaukee Area Violent Crimes Task Force ("MAVCTF"). My duties as a Special Agent with the FBI include investigating violent crimes such as commercial robberies, carjackings, bank robberies and violent criminal enterprises. I have gained experience in the conduct of such investigations through previous case investigations, formal training, and in consultation with law enforcement partners in local, state, and federal law enforcement agencies.

3.     This affidavit is based upon my personal knowledge as well as information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is also based upon information gathered from interviews of citizen witnesses, reports, official records, law enforcement reports, and my training and experience.

4.     Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of Title 18, United States Code, Sections

2113(a) and (d) (armed bank robbery), Title 18, United States Code, Section 1951 (Hobbs Act

robbery), and 924(c) (brandishing a firearm in furtherance of a crime of violence) have been

committed by Brandon Mickey and others.

5.     More specifically, I seek authorization to search Facebook's information

associated with Brandon Mickey:

| NAME | FACEBOOK IDENTIFICATION (UID) | FACEBOOK NAME |
| --- | --- | --- |
| Brandon Mickey | 100009392854252 | Rudeboy Mickey |

## PROBABLE CAUSE

6.     Law enforcement is investigating a series of robberies and casing incidents that

occurred in Milwaukee between at least March 2015 through at least April 2016. The

investigation to date shows that brothers Bobby Mickey, Brandon Mickey, and Terrill Brown

were involved in armed robberies of commercial businesses and banks. With respect to the bank

robberies, the brothers would send at least one female, usually one of their sisters Dominique or

Doris Brown, into the bank. The female would inquire about either opening an account, using

the restroom, or obtaining change for a larger bill. The female would then leave the bank.

Shortly thereafter, one or two black males would enter the bank and commit a robbery.

Sometimes their efforts would be thwarted when the tellers locked the doors of the bank upon

noticing the female suspect casing the bank and the suspects later approaching wearing masks on

their faces.

2

## BMO Harris Bank Robbery on March 19, 2015

7.      On March 19, 2015, the FDIC-insured BMO Harris Bank located at 414 W.

National Avenue, was robbed by two black males at 9:20 a.m. Both subjects brandished black

semi-automatic handguns. They pointed the guns at the bank employees and ordered the

employees on the floor. One subject demanded cash from the teller drawers while the other

stood guard over the security guard, who had been ordered to the ground. The subject who

guarded the security guard was wearing all dark clothing with the exception of his shoes, which

were gray, with a white border near the soles and a red design on the exterior toe area. The

robbers obtained approximately $6,060 in stolen U.S. currency from the bank.

8.      On "Rudeboy Mickey's" publicly viewable Facebook page, I observed a "selfie"

photograph that appears to have been posted on March 17, 2015, two days before the

aforementioned BMO Harris Bank robbery. In the photo, Brandon Mickey is posing for the

camera wearing what appears to be the same shoes as the robbery suspect who stood over the

guard. Moreover, on the evening of the aforementioned robbery, there are several photos

posted of Brandon Mickey and a female, believed to be Mah Cisse, during which they appear to

be celebrating. The posting associated with one of the photographs reads, "Bankroll." In

addition, there is another posting on March 19, 2015, at approximately 11:00 p.m., of a

photograph of a pair of red Jordan brand tennis shoes on top of a shoe box, presumably a new

purchase.

9.      On March 26, 2015, Brandon Mickey posted on Facebook the following

statement, "Just came back comeing [sic] from seeing my p.o [probation officer] she on my dick

keep asking me how im buying these close in [sic.] shoes in [sic.] shit Bitch im Mr kickdoe u

3

know my background." The posting further includes a smiley face emoticon and three icons of firearms.

## Playmakers Sports Complex Robbery on April 13, 2015

10. On April 13, 2015, at about 2:42 p.m., the Playmaker's Sports Complex store located at 2230 N. MLK Drive, in Milwaukee, Wisconsin, was robbed by two black males. The robbery affected interstate commerce. On that date, the suspects entered the business, brandished at least one semi-auto handgun, ordered all of the employees to the ground, and demanded U.S. currency. They obtained $868 in stolen money and stolen clothing items before fleeing the store.

11. A witness outside the store observed the suspects exit the driver's and front passenger seats of a purple Dodge Neon before the robbery. He saw them pull up their hoods and place black masks over the lower portion of their faces just before entering the store. The witness knew they were going to commit a robbery and called 911. After a short time, he saw them flee Playmakers. One had an armful of clothing (front seat passenger). He saw them re-enter the purple Dodge Neon and travel east bound on North Avenue.

12. A cooperating source, hereinafter CS-1, who has provided information that has been corroborated independently through physical evidence and other investigation, and who is familiar with Brandon Mickey and other members of the Brown/Mickey family, provided information to law enforcement under a proffer agreement. CS-1 is currently in state custody and recently pled guilty to two counts of second degree reckless homicide (PTAC). CS-1 is hoping to receive a reduction in his state sentence for his/her information.

4

13.     CS-1 reported his knowledge that Brandon Mickey and Bobby Mickey committed the Playmaker's Store robbery in the Spring of 2015. CS-1 stated that Brandon Mickey stole various clothing items from the Playmaker's Store.

14.     Bobby's cell site records hit off a tower in close proximity to Playmakers around the time of the robbery, and his girlfriend, Karina Johnson, owned a purple Dodge Neon that Bobby was known to drive around that time. The Dodge Neon was also used to commit the below-described May 7, 2015 BMO Harris Bank robbery.

## BMO Harris Bank Robbery on May 7, 2015

15.     On May 7, 2015, the same BMO Harris Bank located at 414 W. National Avenue, was robbed by two black males at 12:36 p.m. According to witnesses, one of the males displayed a black semi-automatic handgun in his left hand. Both men were described as approximately 6'0" tall, 18-25 years of age, with slim builds. The men stole approximately $11,453 in US currency from the federally insured bank.

16.     According to one witness outside the bank, another witness who entered the bank just prior to the robbery and one of the security guards, a black female walked up to the locked bank doors just prior to the robbery. She patted her pockets, as if she lost something. She then gestured to the guard that she would be back in a minute (index finger in the air). She then walked to the alley west of the bank where two black males were standing. The guard did not see her meet with the males, but the witnesses did.

17.     The female then returned to the bank doors as another customer entered the bank. She grabbed the doors before they closed. The two males then ran up behind her, pushed her out of the way, and used the security guard as a shield as they entered the bank to rob it.

5

18. A later review of the surveillance footage reflects that a second black female entered the bank approximately 45 minutes prior to the robbery to ask about opening an account. Dominique Brown identified herself as this female; however, she claimed that she had no involvement in the robbery.

19. Cell site records for telephone number (414) 698-1712, a phone used by Dominique Brown, reflect that the phone was utilizing a cell tower in close proximity to the victim BMO Harris Bank from 12:35 p.m. to 12:37 p.m. (Robbery occurred at 12:35 p.m.) Similarly, cell site records for Dominique's brother, Bobby Mickey, show that his phone with number (414) 394-8790 was utilizing a tower near the bank during the time that the first female entered the bank around 11:40 a.m. (casing at 11:48 a.m.) and just before the robbery at 12:28 and 12:32 (robbery at 12:37 p.m.).

20. CS-1 identified the two female casers as Doris and Dominique Brown. CS-1 further identified the robber dressed in the black jacket as Bobby Mickey and the robber in the gray sweatshirt as Brandon Mickey. In addition, Bobby Mickey's cell site records show that his phone was also in use in close proximity to the Bank Mutual for six calls between 10:53 a.m. and 11:08 a.m. (casing at 11:08 a.m.). Although CS-1 could not say whether Brandon Mickey holds a gun in his left-hand, CS-1 could say that Brandon Mickey punches with his left hand.

21. On Dominique Brown's Facebook page, "Msmagnifasent Lyen Brown." On Brown's Facebook page, in addition to multiple photos of Dominique Brown, law enforcement observed a photo from May 7, 2015, showing a "fan" of bills ranging from $1 to $100 (more than 50 bills total). The caption reads, "no tax money made this in seconds..." Law enforcement was able to observe the serial number from one of the bait bills from BMO Harris Bank robbery on May 7, 2015 on one of the $50 bills in the photo.

6

## Dhillon Liquor Store robbery on June 9, 2015

22. On June 9, 2015, at approximately 1:53 p.m., two black males entered the Dhillon Liquor Store located at 5832 W. Burnham Street, in West Allis, Wisconsin and robbed the store of $60 cash and three bottles of liquor (Remy Martin Cognac, Jose Cuervo, and Hennessy). One suspect wore all black clothing and attempted to cover his face/head with a white towel. This suspect was not wearing gloves but used a blue latex-type glove to remove the cash from the register. The other suspect wore a hooded sweatshirt and mask over the lower portion of his face. This is the suspect who brandished a black handgun, pointed it at the store owner, and stole the three bottles of liquor from the store shelves.

23. The store owner ran after the suspects and observed them enter the back seats of an older gold-colored 4-door sedan, which was waiting in the alley near the store. He obtained a partial license plate of 772 or 722. A witness outside the store reported that at approximately 1:30 p.m., he observed 3-4 black males parked in a gold 4-door sedan backed into a parking spot in parking lot NE of Dhillon's. Another witness outside the store reported that he saw a male with a high "shaggy fro" exit the front passenger seat of a gold 4-door sedan and enter Dhillon's.

24. The store owner also believed that a man who entered the store and purchased a bottle of juice about 20 minutes prior to the robbery may have also been involved and served as a lookout. This man purchased the juice and then asked for change for a $20. Upon receiving two $10, the man asked for change for another $20, which the store owner refused to do. The store owner believed this man changed clothes and came back with another man and robbed the store.

25. That evening, around 9:00 p.m., a Milwaukee County Sheriff's Deputy saw a car that matched the suspect vehicle description. It was a tan-colored 2000 Lincoln 4 door, with

7

Wisconsin license plate 722-XLY. Brandon Mickey was the driver and registered owner of the vehicle. Brandon denied any involvement in the robbery. He initially stated that his friend "Xavier Allen" borrowed the vehicle, but then stated that his girlfriend, Mah Cisse, actually had possession of the vehicle. When Mah Cisse was finally located and questioned several days later, Mah Cisse stated she had the vehicle over the time of the robbery and was getting her hair done at 31st and Walnut around the time of the robbery.

26. Brandon consented to a search of the car and officers located a blue latex glove in the back seat pocket and a similar latex glove in the glovebox. The glove appears consistent with the blue latex glove that the suspect used to empty the cash from the register during the Dhillon Liquor Store robbery.

27. In a photo array, the store owner identified Brandon Mickey as the suspect who purchased the juice and as one of the robbery suspects.

28. CS-1 viewed the surveillance footage and identified the two robbers as Bobby Mickey and Terrill Brown. CS-1 also identified the suspect vehicle in the footage as Brandon's car. CS-1 further stated that the evening of the robbery, CS-1 was at the Mickey/Brown household and heard Brandon Mickey, Bobby Mickey, and Terrill Brown talking about a robbery they had just committed. They had bottles of liquor, which CS-1 understood to be stolen during the robbery, and Mickey/Brown brothers discussed how the victim had run after them. Bobby handed CS-1 the .380 handgun so that CS-1 could attempt to fix it because the firearm was jamming.

29. CS-1 was also with the Brown/Mickey family members when Brandon was arrested later that evening. CS-1 was aware that the victim had reported his observation of Brandon's vehicle and had been able to read a portion of the license plate.

8

30.    The day after the Dhillon Liquor Store robbery, Bobby Mickey posted a photo on his Facebook page depicting himself wearing a pair of jeans with a rip pattern that is consistent with one of the robbers and holding a bottle of Remy Martin Cognac, which is the same liquor stolen during the robbery.

## Walgreen's Robbery on November 4, 2015

31.    On November 4, 2015, at approximately 9:00 p.m., the Walgreens store located at 2727 W. North Avenue, in Milwaukee, Wisconsin, was robbed by one black male subject who brandished a handgun in his left hand. The subject was wearing a Packers winter stocking cap, a white Adidas zip-up jacket with black stripes down the sleeves, blue jeans, and white shoes. He also wore a black cloth mask over the lower portion of his face. The robbery suspect made demands for money from the Walgreens employees and pointed a silver/chrome handgun at the employees. After obtaining stolen U.S. currency and placing it into his pocket, the suspect fled Walgreens. The robbery affected interstate commerce.

32.    After the robbery, the armed security guard left Walgreens and witnesses told him to where the suspect had fled. The security guard got into his car and engaged in a vehicular pursuit of a red Chevrolet Blazer with registration plate 888-XRU. During the pursuit, someone seated in the rear passenger seat of the Blazer began shooting at the security guard from the rear driver's side window. The security guard returned fire at the vehicle using his service weapon. Eventually, the driver of the Chevrolet Blazer crashed the vehicle. The driver and the armed suspect fled the Blazer and were not apprehended. The security guard identified the rear passenger/shooter as the robbery suspect. Neither the driver nor the passenger was apprehended that day.

9

33. Inside the Blazer, officers recovered the following items, among others: a Cobra .380 caliber chrome handgun near the driver's seat, a bag containing drug paraphernalia, a Green Bay Packers jacket, a WI Identification Card of Travis Office (DOB XX/XX/1987), a WI Instruction Permit for N.B., and four cellular telephones, including a touch screen Blu Dash 5.5 phone.

34. The red Blazer was registered to K.M. K.M. told law enforcement that his ex-girlfriend, N.B., possessed the vehicle at the time of the Walgreens robbery. N.B. contacted K.M. the night of the robbery asking him to report the Blazer as stolen. When questioned, N.B. stated that she loaned the Chevy Blazer to "B-Dogg," who she identified by photograph as Brandon Mickey (DOB XX/XX/1995). She stated that she knows Mickey through her fiancé, Travis Office (DOB XX/XX/1987). Mickey told N.B. that he wanted to use her car so that he could pick up some money. N.B. stated that when he borrowed her car, Mickey was wearing blue jeans, a white Adidas jacket, and a Green Bay Packers winter-style hat. N.B. claimed that no one was with Mickey when he borrowed her car. N.B. viewed a surveillance still photo from the aforementioned Walgreens robbery and identified the robbery suspect as Mickey. N.B. further stated that when Mickey did not return with her car, she called K.M. to report it stolen that evening.

35. When questioned, Brandon Mickey initially denied that he knew N.B. However, after further questioning, he stated that he had seen her once before at a bar, but he did not know her. Mickey denied ever borrowing a vehicle from N.B. and denied being involved in the aforementioned armed robbery.

36. CS-1 reviewed the surveillance footage for the Walgreen's robbery. CS-1 identified the robber as Brandon Mickey. CS-1 recognized the robber's jeans as jeans CS-1 used

10

to own and had provided to Brandon Mickey. CS-1 further recognized the robber's mannerisms to be that of Brandon Mickey.

37. CS-1 confirmed that Brandon Mickey uses Facebook username "Rudeboy Mickey," which is associated with Facebook Identification Number 100009392854252. The publically viewable photos on Brandon Mickey's Facebook page show a number of "selfie" photos and other photos of Brandon Mickey, which further support my belief that Brandon Mickey is the user of this Facebook username.

38. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

39. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

40. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can

11

exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

43. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.

12

When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

44.     Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

45.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

46.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

47.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

48.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log

13

includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

49.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

50.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

51.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

52.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

53.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

14

rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

54.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

55.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

56.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user

15

attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

57. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

16

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

58.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

59.     Based on the forgoing, I request that the Court issue the proposed search warrant. I submit that there is a probable cause to believe that Brandon Mickey committed the above-described robberies. I am aware that individuals involved in robberies commonly post on their personal Facebook pages photographs of robbery proceeds and other tools and articles used to commit robberies. I am further aware that at least one individual has identified Mickey in robbery surveillance footage based, in part, on distinct clothing and mannerisms. I have personally observed a photograph of Brandon Mickey posted to Facebook in which he is wearing shoes that are consistent with one of the robbers' shoes during a robbery. I submit that there is probable cause to believe that Brandon Mickey's Facebook records contain evidence of his involvement in the above-described robberies. This evidence may include, but is not limited to, photos of Mickey wearing the same clothing he wore during the robberies, identification of his phone number, admissions regarding his involvement in the robberies, and/or photos of proceeds from the robberies.

60.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

17

(c)(1)(A). Specifically, the Court is "a district court of the United States in the Eastern District of Wisconsin that has jurisdiction over the offense being investigated." 18 U.S.C. § 2113(a) and (d) (armed bank robbery), 1951 (Hobbs Act robbery), and 924(c) (brandishing a firearm in furtherance of a crime of violence)

61.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant

18

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook Account(s):

| NAME | FACEBOOK IDENTIFICATION (UID) | FACEBOOK NAME |
|------|-------------------------------|---------------|
| Brandon Mickey | 100009392854252 | Rudeboy Mickey |

that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

2

## ATTACHMENT B

### Particular Things to be Seized

## I.    Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including for user "Rudeboy Mickey" with user ID 100009392854252: full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

(d)    All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e) All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(f) All "check ins" and other location information;

(g) All IP logs, including all records of the IP addresses that logged into the account;

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(i) All information about the Facebook pages that the account is or was a "fan" of;

(j) All past and present lists of friends created by the account;

(k) All records of Facebook searches performed by the account;

(l) All information about the user's access and use of Facebook Marketplace;

(m) The types of service utilized by the user;

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p) All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

2

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18, United States Code, Section 1951 (Hobbs Act robbery); 2113(a) and (d) (armed bank robbery), and 924(c) (brandishing a firearm in furtherance of a crime of violence) involving Brandon Mickey since March 1, 2015, including, for the user ID identified on Attachment A, information pertaining to the following matters:

- (a) Communications between known subjects. Communications between known subjects and unknown subjects. Pictures of clothing and firearms used during captioned investigation. Preparatory steps taken in furtherance of the robbery.

- (b) Communications related to photos/attachments. Communications related to travel. Communications related to dates.

- (c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

- (d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

- (e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

- (f) The identity of the person(s) who communicated with the user ID 100009392854252 regarding matters relating to the aforementioned violations of the United States Code.

3